USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED SEP 2 6 2018

E.E., *individually and on behalf of* G.E.,

Plaintiffs,

v.

NEW YORK CITY DEPARTMENT OF
EDUCATION,

Defendant.

No. 17-CV-2411 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff E.E., (the "Parent") individually and on behalf of his minor child G.E. (the "Student"), brings this action against the New York City Department of Education (the "DOE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. After concluding that the DOE's proposed education plan and school placement would not provide his son, a child with autism, with a free appropriate public education ("FAPE"), the Parent placed him in the Rebecca School, a private school for children with disabilities, for the 2015-2016 academic year. Following decisions by state review agencies in favor of the DOE, the Parent commenced this action. Both parties now move for summary judgment. For the following reasons, the DOE's motion for summary judgment is granted, and the Parent's motion is denied.

## LEGAL STANDARD

"The IDEA requires a state receiving federal funds under the IDEA to provide disabled children with a FAPE." *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 102 (2d Cir. 2016) (citation and alterations omitted). "In order to ensure that disabled children receive a free appropriate public education, school districts must create individual education programs ("IEPS") for such children."

*C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 72 (2d Cir. 2014). An IEP "is a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (citation omitted).

In New York, Committees on Special Education ("CSEs") convened by the local school district are responsible for developing IEPs. N.Y. Educ. Law § 4402(1)(b)(1). "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial behavior and needs." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107–08 (2d Cir. 2007) (citing N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(ww)(3)(i) (hereinafter "NYCRR")). The CSE must also "ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child." 20 U.S.C. § 1414(e).

"If a state fails in its obligation to provide a free appropriate public education to a handicapped child, the parents may enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006). "The Supreme Court has established the three-pronged *Burlington/Carter* Test to determine eligibility for reimbursement, which looks to (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." *C.F.*, 746 F.3d at 73. "Under New York's Education Law § 4404(1)(c), the local school board bears the initial burden of establishing the validity of its plan at a due process hearing. If the board fails to carry this burden, the parents bear the burden of

establishing the appropriateness of their private placement and that the equities favor them." *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 243 (2d Cir. 2015) (citation omitted).

If parents believe that an IEP does not comply with the IDEA, they may file a due process complaint with the appropriate state agency. 20 U.S.C. § 1415(b)(6). They may then challenge the IEP in an "impartial due process hearing," 20 U.S.C. § 1415(f), before an officer ("IHO") appointed by the local board of education, *see* N.Y. Educ. Law § 4404(1). Either the DOE or the parents may subsequently challenge the IHO's decision to the Office of State Review, where it will be reviewed by another officer ("SRO"). *See id.* § 4404(2); *see also* 20 U.S.C. § 1415(g). Finally, the SRO's decision may be challenged in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

## BACKGROUND[1]

### I.    Factual Background

#### A.    The Student

The Student was born on July 28, 2004. Pl. 56.1 ¶ 1. As a resident of Brooklyn, he is eligible to receive educational services from the DOE. Pl. 56.1 ¶ 1. The Parent has been employed by the DOE as a special education teacher for over 27 years. Pl. 56.1 ¶ 1. The Student's mother passed away in early 2011. Pl. 56.1 ¶ 1. He has a twin sister who is typically functioning. Pl. 56.1 ¶ 1. The Student was eleven years old during the 2015-2016 school year at issue. *See* Pl. 56.1 ¶ 1. Since 2009, he has continuously attended the Rebecca School. Pl. 56.1 ¶ 6.

The Student has been diagnosed with Autistic Spectrum Disorder with resulting cognitive, social, and emotional deficits, global developmental delays, severe speech apraxia, sensory

---

[1] These facts are drawn from the parties' submissions in connection with the instant motions for summary judgment, including the Rule 56.1 Statements submitted by the Parent ("Pl. 56.1") and the DOE ("Def. 56.1"), as well as their respective counterstatements. Where facts in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied only by way of conclusory statement without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c)–(d).

integration disorder, and a complex feeding disorder. Pl. 56.1 ¶ 2. The Student requires extensive help in terms of academic needs, functioning skills, visual-spatial and motor planning, communication, self-regulation, peer interaction, daily living activities, body awareness, behavioral issues, attention, focus, and sensory challenges. Pl. 56.1 ¶ 2. He is predominantly non-verbal and communicates using vocal approximations, word utterances, sign approximation, gestures, and facial expressions. Pl. 56.1 ¶ 3.

### B. The CSE

On January 12, 2015, the school district convened a CSE to develop an IEP. Def. 56.1 ¶ 9. The CSE consisted of the following members: (1) Rose Fochetta, a certified school psychologist employed by the DOE; (2) Feng Ye, a DOE special education teacher; (3) the Parent; (4) Christine Calvaruso, a teacher at the Rebecca School, who participated by phone; and (5) Bonne Earing, a social worker employed by the Rebecca School. Def. 56.1 ¶ 10. The CSE classified the Student as having autism and recommended the following accommodations: a 6:1:1 specialized 12-month class, along with occupational therapy, speech/language therapy, and counseling. Def. 56.1 ¶ 13.[2]

### C. The Placement and the Due Process Complaint

The DOE sent a "Prior Written Notice (Notice of Recommendation)" to the Parent dated May 29, 2015 that summarized the program and services recommended in the IEP. Def. 56.1 ¶ 19. On the same day, the Parent entered into an enrollment contract with the Rebecca School for the 2015-2016 school year and agreed to pay the annual tuition of $113,520.00. Def. 56.1 ¶ 22. The contract permitted the Parent to withdraw the Student in the event he was offered an appropriate public school placement. Pl. CS. 56.1 ¶ 22. The Rebecca School is a twelve-month program, and the majority of the 127 students are diagnosed with autism spectrum disorder. Def. 56.1 ¶ 23. The

---

[2] The 6:1:1 ratio refers to the number of students per staff members in the class, *i.e.*, 6 students, 1 teacher, and 1 paraprofessional. Pl. 56.1 ¶ 5 n.2.

students range in age from 5 to 21. Def. 56.1 ¶ 23. There are 15 classes and a 2:1 teacher-student ratio. Def. 56.1 ¶ 24. The Student receives OT, SP, PT, and music therapy. Def. 56.1 ¶ 25.

The DOE also sent the Parent a school location letter dated, incorrectly it says, January 13, 2015, attaching the prior written notice. Def. 56.1 ¶ 19. The DOE offered the Student a placement at P.S. K396. Def. 56.1 ¶ 19. P.S. K396 serves approximately 262 children ranging in age from 4. 9 to 14 years and provides instruction in pre-K through 8th grade. Def. 56.1 ¶ 19. On June 16, 2015, Hanraj Soodoosingh, the intake coordinator at P.S. K396, gave a tour to the Parent and members of the Rebecca School. Def. 56.1 ¶ 20. He showed them several 6:1:1 classes, the school library, a vocational room, and the PT/OT gym and sensory room. Def. 56.1 ¶ 21.

### D.  The Administrative Hearing and Decision

On September 25, 2015, the Parent filed a request for a due process impartial hearing. Def. 56.1 ¶ 28. There was a prehearing conference on October 30, 2015, and four subsequent days of proceedings on February 4, March 18, April 20, and June 22, 2016. Def. 56.1 ¶ 29. On August 30, 2016, the IHO issued its decision, finding in favor of the DOE. Def. 56.1 ¶ 30. The IHO determined that the IEP had provided the Student with a FAPE. The IHO also addressed the second and third prongs of the *Burlington/Carter* framework, concluding that the Rebecca School provided the Student with an educational program that satisfied his needs and that equitable considerations would not have precluded the Parent from receiving monetary relief had the DOE failed to provide a FAPE. IHO Dec. 14–15.

### E.  The State Review Officer's Decision

On October 4, 2016, the Parent sought administrative review of the IHO's Prong I determination before the SRO. Def. 56.1 ¶ 37. By decision dated January 4, 2017, the SRO found in favor of the DOE and dismissed the appeal. SRO Dec. 7. Because the DOE did not cross-

appeal the findings regarding the second and third prongs of the *Burlington/Carter* framework, the SRO did not address those aspects of the IHO's decision. *See* SRO Dec. 41.

## II. Procedural History

On April 4, 2017, the Parent commenced this action, alleging that the SRO erred in affirming the IHO. ECF No. 1. The parties thereafter made cross motions for summary judgment based on the administrative record. ECF Nos. 14, 19.

## STANDARD OF REVIEW

"Summary judgment in [the IDEA] context involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." *L.O.* 822 F.3d at 108 (citation omitted). "In considering an IDEA claim, a district court must engage in an independent review of the administrative record and make a determination based on the preponderance of the evidence." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837–38 (2d Cir. 2014) (citation omitted). However, "[t]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *Gagliardo*, 489 F.3d at 112 (citation omitted). "This review requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete *de novo* review." *L.O.*, 822 F.3d at 108 (citation omitted).

In particular, the district court "must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *M.O.*, 793 F.3d at 243 (citation omitted). "The [degree of] deference owed depends on both the quality of the opinion and the court's institutional competence." *C.F.*, 746 F.3d at 77. "[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning

6

whether the IEP was developed according to the proper procedures." *Id.* at 77 n.7 (citation omitted).

## DISCUSSION

"In determining whether an IEP complies with the IDEA, courts make a two-part inquiry, that is, first, procedural, and second, substantive." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013) (citation omitted). For procedural violations, courts "examine the procedural adequacy of [an] IEP asking whether the state has complied with the procedures set forth in the IDEA." *L.O.*, 822 F.3d at 109 (citation and alterations omitted). With respect to substantive adequacy, the Supreme Court has recently clarified that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 1001 (2017).

As set forth below, the SRO's 41 page opinion is thorough, well-reasoned, and supported by the record. The Court thus finds that under the first *Burlington/Carter* prong, the DOE offered the Student a FAPE and it need not address the appropriateness of the Rebecca School as an alternative or the equities.

### I.     Procedural Challenges

The Court will first address the Parent's procedural challenges. The initial procedural inquiry in an IDEA case "is no mere formality. . . . [A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998) (citation omitted). "Under this framework, procedural violations will entitle parents to relief only if they impeded the child's right to a FAPE, significantly impeded the parents' opportunity

to participate in the decision[-]making process regarding the provision of a FAPE to the parents' child, or caused a deprivation of educational benefits." *L.O.*, 822 F.3d at 109 (citations and alterations omitted). "That is, parents must articulate how a procedural violation resulted in [an] IEP's substantive inadequacy or affected the decision-making process." *Id.* (citation omitted). "[M]ultiple procedural violations . . . may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *Id.* (citation and alterations omitted).

The Parent asserts three procedural challenges: (1) the failure to conduct a functional behavioral assessment ("FBA") and develop a behavioral intervention plan ("BIP"); (2) the absence of transitional services; and (3) the IEP was predetermined. After examining these procedural challenges, the SRO concluded that to the extent procedural deficiencies occurred, they did not deny the Student a FAPE. The Court agrees.

## A.    Failure to Conduct an FBA and Implement a BIP

The Parent primarily argues the Student was denied a FAPE because the CSE did not perform an FBA or implement a BIP. Although the Parent rightly notes the absence of both, these flaws do not rise to the denial of a FAPE.

The IDEA requires a school district to "consider the use of positive behavioral interventions and supports, and other strategies" to address behavior by a disabled child that "impedes the child's learning or that of others." 20 U.S.C. § 1414(d)(3)(B)(i). "New York state regulations go beyond this floor set by the IDEA; they require a school district to conduct a full FBA for a student who exhibits behavior that impedes learning, and to develop a BIP to address that behavior." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 169 (2d Cir. 2014). Although the failure to conduct an adequate FBA or implement a BIP is a "serious procedural violation," it "does not rise to the level of a denial of a FAPE if the IEP adequately identifies the problem behavior and prescribes ways to manage it." *R.E.*, 694 F.3d at 190. "[W]hether an IEP

8

adequately addresses a disabled student's behaviors and whether strategies for dealing with those behaviors are appropriate are precisely the type of issues upon which the IDEA requires deference to the expertise of the administrative officers." *M.W.*, 725 F.3d at 140 (citation and alterations omitted).[3]

Here, the January 2015 IEP incorporated information from the December 2014 Rebecca School report, identifying the Student's behaviors of crying and acting out, including pushing objects and people. The IEP also relayed information from his teacher at the Rebecca School, namely that he became upset daily for about 5 to 15 minutes and typically cried. Ex. 1 at 3. Although his teacher could not indicate the frequency with which the Student became aggressive, the IEP specified the causes of this behavior: "His aggression is not viewed as an attempt to harm, but an attempt to communicate when he is unable to do so. When aggressive, he needs support to help him communicate. He benefits from sensory supports during these times to help him re-regulate along with calm and soothing affect from an adult." Ex. 1 at 3.[4] The IEP also prescribed five sessions per week of both occupational therapy and speech-language therapy, as well as identified sensory diet strategies that had previously been employed at the Rebecca School with some degree of success. Ex. 1 at 3, 9–10. The IEP thus both assessed the causes of the Student's problematic behaviors and specified strategies for remedying them. It was not unreasonable, therefore, for the SRO to conclude that the Student was provided a FAPE despite the failure to conduct an FBA and implement a BIP. *See E.H. v. NYC Dep't of Educ.*, 611 F. App'x 728, 730–

---

[3] There is some dispute as to the manner in which the parties elected not to conduct an FBA. Although Ms. Fochetta testified that the Parent and officials from the Rebecca school deemed one unnecessary, which is reflected in the IEP, Ex. 1 at 7, before the IHO Ms. McCourt testified that she and the Parent harbored that belief only in the event the Student remained at the Rebecca School, Tr. 234:15–235:5. Regardless, it was the DOE's duty to comply with these procedural requirements.

[4] The inability to specify the frequency of these behaviors highlights a practical problem with the FBA requirement as applied to the present facts. Such data could not be collected by the DOE on its own because the Student was already attending the Rebecca School. To gather such information, therefore, the cooperation of the Parent and/or Rebecca School staff was required.

31 (2d Cir. 2015) ("Here, the DOE evaluated M.K.'s psychological reports and his progress at the Rebecca School, spoke to M.K.'s teacher, and asked E.H. for input. Because this process 'adequately identifie[d]' M.K.'s 'behavioral impediments' and created 'strategies to address that behavior,' the DOE's failure to conduct a formal assessment did not deny M.K. a FAPE."); *T.M.*, 752 F.3d at 169 ("The SRO's decision turns on her evaluation of whether T.M.'s behavior would interfere with his learning, and whether Cornwall had taken adequate steps to address that behavior."); *R.E.*, 694 F.3d at 193 (student not denied a FAPE where IEP included specific strategies to address behaviors).

### B.     Transitional Services[5]

The Parent also correctly notes that pursuant to New York law, "an IEP [must] identify temporary transitional support services to be provided to an autistic student's new classroom teacher when that student is transferring from a private school to a public school program or to a less restrictive classroom setting." *A.M. v. N.Y.C. Dep't of Educ.*, 845 F.3d 523, 540 (2d Cir. 2017). The Parent, relying on that language in *A.M.*, argues that the failure to identify temporary transitional support services rendered the IEP inadequate. The Court disagrees and finds, like in *A.M.*, while "the absence of [such] services in the IEP for [the Student's] would-be public school classroom teacher was a procedural violation, it did not deny [the Student] a FAPE." *Id.*[6]

---

[5] The Court has construed this particular challenge by the Parent to be procedural in nature. To the extent it is instead asserted as a substantive challenge, it would fail for largely the same reasons, especially in light of the greater degree of deference owed to state review officers with respect to such challenges.

[6] It seems that the Parent did not make this assertion in his due process complaint, *see generally* Ex. B., or argue it before the IHO or SRO, who accordingly issued opinions without addressing the lack of transitional services, *see generally* IHO Dec., SRO Dec. Since the Parent does not appear to have amended his due process complaint, *see C.W. v. City School District of the City of New York*, 171 F. Supp. 3d 126, 136 n.3 (S.D.N.Y. 2016), this failure could bar review before this Court, *see L.B. v. Katonah-Lewisboro Union Free School District*, No. 14-CV-6805 (KMK), 2016 WL 4926203, at *17 n.32 (S.D.N.Y. Sept. 14, 2016). Nonetheless, particularly because the DOE does not object, the Court will address the merits of this argument. Indeed, the Circuit has warned district courts against "mechanically appl[ying]" the waiver doctrine. *C.F.*, 746 F.3d at 78.

The December 2014 Rebecca School report noted that although the Student benefitted from routines, he had made progress in coping with unexpected changes. *See* Ex. 11 at 1 (noting that the Student "is a very smart student who relies on routine and memory based ideas but since May has shown an increase in his ability to think more symbolically and flexibly"); Ex. 11 at 2 ("Since May, [the Student] has shown progress in his ability to re-regulate with adult support (calm and soothing affect) and redirection and can now do so generally within five minutes with low language and trusted adult support."); Ex. 11 at 4 ("For example, recently something changed on the schedule and [the Student] became very upset over the change. During this time, [the Student] allowed the adult to help him co-regulate him . . . . In the past [the Student] would get more upset when the adult was trying to help him through a negative emotional experience."). This improvement thus mitigated the need for transitional services. *See A.M.*, 845 F.3d at 540 (failure to provide transitional services did not deny student a FAPE, in part because "although [the student] had initially 'had a really hard time with transitions . . .' he had 'made really nice gains in that where he transitions not only from the classroom to [occupational therapy], but between preferred and non-preferred activities without any behavioral overreactions'"). This evidence suggests, as in *A.M.*, that "because [the Student] had made significant progress in his ability to transition between classroom settings without resulting in any notable problems, the failure to specify transitional support services in the IEP for [the Student's] teacher could not have deprived [the Student] of a FAPE." *Id.*

Ms. McCourt, the Rebecca School Director, did testify that a new teacher could not provide the necessary support for the Student to transition to a less restrictive environment. Tr. 227:16–228:17. But the Court is unpersuaded by such conclusory opinions offered retrospectively, particularly in light of Ms. McCourt's lack of knowledge with respect to the competency of the

teacher who would be responsible for the Student in the event he transferred back to the district. Indeed, she largely refused to offer opinions regarding the abilities of her staff relative to other teachers for this precise reason. Tr. 227:7–13.

Furthermore, while the IEP did not prescribe transitional services, it included instructions for when there are changes to the Student's routine. The IEP noted, for instance, that "[the Student] benefits from support to review his schedule to plan and organize his day. Within a group, he requires redirection and sensory support in order to focus his attention. He can become ridged [*sic*] with regard to his schedule. [The Student] is able to transition throughout the day, however unexpected changes can be difficult and he benefits from advanced warnings." Ex. 1 at 2. Based on the record, therefore, the failure to provide transitional services did not deprive the Student of a FAPE.

## C.      Predetermination

In the course of mounting a substantive challenge to the program recommendation, which will be addressed in due course, the Parent appears to further argue that the IEP was procedurally deficient because it was predetermined. This argument similarly lacks merit.[7]

The parties do not dispute that the IEP at issue was substantively similar to the Student's previous IEPs. But the critical consideration with respect to predetermination is whether the CSE possessed "an open mind as to the content of [the] IEP." *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 253 (2d Cir. 2009). District representatives, therefore, may "prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and the parents have an opportunity to make objections

---

[7] Before the IHO and the SRO, the Parent also made the related argument that he was not sufficiently involved in the formulation of the IEP, constituting yet another procedural defect. SRO Dec. at 8. He, however, appears to have abandoned that argument before this Court, which in any event is belied by the record. *See* Tr. 430:14–432:21.

and suggestions." *DiRocco ex rel. M.D. v. Bd. of Educ. of Beacon City Sch. Dist.*, No. 11-CV-3897 (ER), 2013 WL 25959, at *18 (S.D.N.Y. Jan. 2, 2013) (citation and alterations omitted).

Here, there is no basis for concluding that the IEP was predetermined. Even the Parent testified that the district representatives "discussed everything" at the CSE and "just legitimately felt that 6:1:1 works." Tr. 430:14–19. He further averred that members of the CSE were respectful and listened to him when he voiced objections. Tr. 431:5–11, 432:15–21. Mere disagreement between the Parent and district officials does not compel the conclusion that the IEP was pre-determined. *See T.F. v. N.Y.C. Dep't of Educ.*, No. 14-CV-3401 (WHP), 2015 WL 5610769, at *5 (S.D.N.Y. Sept. 23, 2015) ("A professional disagreement is not an IDEA violation." (citation omitted)).

Before the IHO, moreover, Ms. Fochetta testified that she and her colleagues in no way pre-determined the IEP. Tr. 56:5–14. She elaborated that the CSE decided that the ten-month programs would not satisfy the Student's needs and accordingly only considered twelve-month programs. Tr. 53:16–21. At that point, the CSE considered several different class compositions: 12:1:1, 8:1:1, and 6:1:1. Tr. 53:22–54:2. The IHO found Ms. Fochetta credible, IHO Dec. 10, a finding affirmed by the SRO, SRO Dec. 10 n.7. There is no basis to disturb this credibility assessment. *See P.C. v. Oceanside Union Free Sch. Dist.*, 818 F. Supp. 2d 516, 524 (E.D.N.Y. 2011).[8]

---

[8] In an attempt to bolster his argument, the Parent asserts that the IEP at issue contained the same age information pertaining to the Student as the previous IEP, which obviously was no longer accurate. *See* Pl. MSJ at 3 n. 4, ECF No. 15. As explained at the hearing, however, the age reference with which the Parent takes issue was not an indication as to the purported age of the Student at the time of the IEP's formation, but rather when his speech and language skills were evaluated. *See* Tr. 94:11–15.

**D.  Cumulative Effect**

The Second Circuit has "held that [m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *L.O.*, 822 F.3d at 123 (citation omitted).  But even multiple violations will not amount to denial of a FAPE where "the procedural deficiencies were formalities and the record shows that the Parents were afforded a full opportunity to participate in the IEP process." *R.B. v. New York City Dep't of Educ.*, No. 15-CV-6631 (DLC), 2016 WL 2939167, at *9 (S.D.N.Y. May 19, 2016).  Although the IEP did contain some procedural errors, the Court will defer to the conclusions of the IHO and SRO, who agreed that these errors neither individually, nor cumulatively, denied the Student a FAPE. *See J.C. v. N.Y.C. Dep't of Educ.*, 643 F. App'x 31, 33 (2d Cir. 2016).

**II.  Substantive Challenges**

The Parent also asserts numerous substantive challenges to the IEP, which the SRO properly rejected.  With respect to substantive adequacy, the Supreme Court has declined to impose a "bright-line rule," instead emphasizing that "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Endrew F.*, 137 S. Ct. at 1001.  The fact-specific nature of this determination, however, does not permit "courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* (citation omitted).  As the Supreme Court has recently reminded district courts, the guiding inquiry is whether the IEP was "reasonably calculated to enable a child to make progress appropriate in light of [his] circumstances." *Id.*

Specifically, the Parent mounts the following challenges: (1) the program recommendation was inappropriate; (2) the Student required a 1:1 paraprofessional; (3) the IEP failed to prescribe the appropriate teaching methodology; (4) the goals were inappropriate; and (5) the IEP did not

adequately address the Student's sensory and management needs. The Court considers these arguments in turn, bearing in mind that, "[i]n light of the relative institutional competence of the state's adjudicators in addressing matters of education policy, more deference is owed to the SRO's decision regarding the substantive adequacy of the IEP than was owed in the prior analysis regarding procedural adequacy." *P.G. v. N.Y.C. Dep't of Educ.*, 959 F. Supp. 2d 499, 511 (S.D.N.Y. 2013).

Before turning to the Parent's individual substantive challenges, the Court pauses briefly to address the Supreme Court's recent decision in *Endrew F. v. Douglas County School District.* The Parent contends that this decision effectively invalidated Second Circuit precedent by crafting a higher standard school districts must satisfy in formulating IEPs. Since briefing in this matter was complete, however, the Court of Appeals has refuted this notion, finding, as the DOE argues, that the standard previously employed in this circuit is in accord with *Endrew F. See Mr. P. v. West Hartford Bd. of Educ.*, 885 F.3d 735, 756–57 (2d Cir. 2018) ("Prior decisions of this Court are consistent with the Supreme Court's decision in *Endrew F.*"), *petition for cert. filed* (June 21, 2018). Accordingly, the IHO and SRO applied the proper legal standard, and this Court is required neither to show those decisions less deference nor to apply a heightened standard in assessing the substantive adequacy of the IEP at issue.

A.    **Appropriateness of Program Recommendation**

The Parent first asserts that the 6:1:1 program recommendation was insufficient. The DOE offered ample testimony, however, to the contrary. The CSE recommended this placement due to the Student's significant, global impairments. Tr. 53:1–54:2. Ms. Fochetta testified, for instance, that such classes are intended for students with intensive management needs and significant impairments. Tr. 51:23–52:3. She further explained that students in such a class would receive

direct teacher assistance for particular tasks. Tr. 52:4–7. Moreover, where required by the IEP, the teacher would provide one-on-one instruction. Tr. 52:8–21.

This finding was bolstered by evidence regarding the Student's progress. For instance, the December 2014 Rebecca School progress report, as reflected in the IEP, indicated that the Student was independent during most daily activities and participated in group activities for art, music, reading, social studies, and occupational therapy. Ex. 11 at 7. The SRO acknowledged that the Student required verbal support to remain engaged in activities with peers and to process frustration. But, as the SRO similarly noted, the Rebecca report also indicated that the Student had begun to accept peer support when upset or frustrated and that classroom staff supported the student by helping him ask a peer for hand squeezes when upset. Ex. 11 at 4.[9]

It is true that at the Rebecca School, the Student was in a class consisting of six students and three teachers. The Parent asserts that there was a "consensus . . . there is insufficient, individualized support in a 6:1:1 program to help the Student attain a regulated state and be available for learning." Pl. MSJ at 20. But the testimony to which the Parent cites does not support this proposition. *See* Tr. 198, 235, 239, 250, 258, 311, 325, 345, 362, 398–99. Indeed, there was no unequivocal evidence that the Student could not make sufficient progress in a context other than the 2:1 setting implemented by the Rebecca School, such as the recommended 6:1:1 program. *See Z.C. v. N.Y.C. Dep't of Educ.*, 222 F. Supp. 3d 326, 335 (S.D.N.Y. 2016) ("[W]hile Plaintiff's witnesses were consistent in testifying that E.C. needs direct adult support when dysregulated, there was no clear consensus that this support was only possible in a 2:1 setting."). The Parent even conceded that he would consider "appropriate" 6:1:1 placements. Tr. 432:15–25. It may

---

[9] Before the IHO, the Parent even conceded that he did not vigorously oppose the 6:1:1 placement, but instead found the measures, as implemented by the twenty-three public schools he had visited, to be insufficient compared to similar services offered by the Rebecca School. *See* Tr. 429:17–430:1, 432:15–25.

well be the case that the Rebecca School's program was better suited to the Student's needs, and the Court is sympathetic to the Parent's desire to have his son in the optimal learning environment. But that not is what the IDEA requires. *See Endrew F.*, 137 S. Ct. at 1001.

### B. 1:1 Paraprofessional

The Parent also argues that the IEP was substantively inadequate by failing to provide a 1:1 paraprofessional. Such paraprofessionals are recommended for students with "very significant behaviors" and the DOE believed that the Student's behaviors did not rise to that level. Tr. 73:11–74:3. The Parent's principal complaints are that the Student needed one-on-one attention in order to safely eat, as well as to navigate the physical spaces of the placement school had he returned to the district because they would have been unfamiliar. The SRO, in the Parent's view, selectively viewed the evidence. The Court disagrees.

Drawing on the December 2014 Rebecca report, for instance, the IEP noted that although the Student benefited from "oral motor support," he was independent with most activities of daily living, including feeding; was working on "expanding his food repertoire"; and no longer required a chew tube. Exs. 1 at 3, 11 at 7. Moreover, the IEP goals related to the Student's oral motor skills were designed, in part, to remediate his tendency to "overstuff" when eating, Tr. 74:4–22, which was intended to further remediate this issue. With respect to the Parent's argument that the Student required a paraprofessional due to his "visual-spatial and motor deficits," as previously noted, the IEP also provided support by mandating five weekly sessions of occupational therapy. Ex. 1 at 3, 9–10. There is thus no basis to disturb the SRO's ruling.

### C. Teaching Methodology

Next, the Parent argues that the IEP was flawed because it failed to recommend Developmental Individual-Difference Relationship" ("DIR"), which is the exclusive methodology

employed at the Rebecca School, and omitted all references to the methodology "despite the fact that this specific methodology is inexorably intertwined with the IEP goals that were developed based on Rebecca School progress reports." Pl. MSJ. at 14. This argument is similarly unavailing.

Numerous courts have rejected this very argument regarding the inclusion of DIR terms in an IEP's goals. *See A.D. v. N.Y.C. Dep't of Educ.*, No. 12-CV-2673 (RA), 2013 WL 1155570, at *12 (S.D.N.Y. Mar. 19, 2013). "[O]nce a court determines that the requirements of the [IDEA] have been met, questions of methodology are for resolution by the states." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 208 (1982); *accord Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003). In *T.C. v. New York City Department of Education*, for example, the court was not persuaded by testimony that the IEP could only be implemented using DIR. No. 15-CV-3477 (VEC), 2016 WL 1261137, at *14 (S.D.N.Y. Mar. 30, 2016). It reasoned that, "[a]lthough the goals are generally methodologically neutral, the IEP, at times, slips into DIR jargon, using the term 'circle of communication,' for example. With all due respect to the proponents of DIR, one does not have to have been trained in DIR to understand what a 'circle of communication' is." *Id.* at 14 n. 21.

Here, the Parent's position is even less tenable than the plaintiff in *T.C.* There is no dispute that the IEP goals are described in a way that is neutral with respect to methodology. Indeed, that is the Parent's primary complaint. Moreover, the IEP did not specify the Student's goals in terms that rendered them dependent on, or otherwise intertwined with, DIR. *T.C.* thus requires the rejection of this argument. As a practical matter, it cannot be that simply because the goals were developed, in part, on Rebecca School progress reports, the IEP was required to implement the same methodology utilized at that school.

### D.  Inappropriate Goals

Relatedly, the Parent also argues that the goals in the IEP were inappropriate for a variety of reasons: the Student had accomplished some of them; the goals no longer reflected present levels of performance; they were vague, not measurable and not specific to his needs and abilities; and there were no assistive technology goals. The SRO took note of these arguments, but found, on balance, that the goals were substantively adequate. The Court discerns no basis to disturb this conclusion.

As the SRO noted, all twelve of the annual goals in the IEP contained criteria for assessing whether they have been achieved, the method of measurement, and a schedule for assessing progress. The goals were developed by the CSE based on a verbal report by the Student's teacher at the Rebecca School. Tr. 68:13–69:11. Ms. Fochetta, the district representative, further testified that the goals were "entwined" with the Student's level of performance at the time. Tr. 122:10–23. There is no indication that any party objected to either the short or long term goals at the time they were drafted.

The SRO recognized that some of the annual goals were broad, such as that "the student will improve his fine motor schools 80% of the time." SRO Dec. 23. Furthermore, as the SRO noted, some of the short-term goals did not include criteria for mastery and/or were difficult to measure, while the level of proficiency required to meet the goals was not especially individualized given the repeated use of 80 percent as the threshold for mastery. But, in viewing the goals in their entirety, the SRO noted that the goals did not render the IEP deficient. Indeed, in this circuit "[c]ourts have been reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress." *P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ.*, 819 F. Supp. 2d 90, 109 (E.D.N.Y. 2011) (collecting cases). The rationale underpinning this body of law is that

"the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim*, 346 F.3d at 382.

Additionally, the SRO reasonably identified certain flaws in the testimony of Rebecca School personnel regarding the Student's previous mastery of certain IEP goals, rendering their opinions less probative. For instance, Colleen Gabbert, the Rebecca School occupational therapist, largely failed to identify specific benchmarks that the Student had allegedly already satisfied. Tr. 276–79, 288, 291–92.[10] And his teacher from the Rebecca School later clarified that one skill she had identified as having been mastered prior to the 2015-2016 school year was not actually satisfied until November of 2015. Tr. 403:19–405:9. Ultimately, and as the SRO noted, even taking the Parent's arguments at face value, the IEP was not substantively inadequate due to the previous mastery of certain goals contained therein. *See A.M. ex rel. Y.N. v. N.Y.C. Dep't of Educ.*, No. 12-CV-5573 (JMF), 2013 WL 4056216, at *12 (S.D.N.Y. Aug. 9, 2013) (declining to grant student relief where goals suffered from a variety of flaws, including that one had already been accomplished); *see also G.S. v. N.Y.C. Dep't of Educ.*, No. 15-CV-5187 (RA), 2016 WL 5107039, at *10–11 (Sept. 19, 2016) (student was provided a FAPE where SRO credited the testimony of district representative that certain of the goals had not previously been completed, leaving one that the student had mastered); *G.S. v. N.Y.C. Dep't of Educ.*, No. 12-CV-8504 (KPF), 2013 WL 5951436, at *19 (S.D.N.Y. Nov. 7, 2013) (IEP did not deny student a FAPE where ten goals had been completed before the school year because the goals were generated as part of a

---

[10] The SRO also discredited Ms. Gabbert's testimony, in part, on the basis that while Ms. Gabbert testified that the Student had mastered the act of wheelbarrow walking ten feet in July of 2015, she did not actually begin working with him until September of 2015. *Compare* Tr. 276:11–23 *with* 293:1–5. The statement on which the SRO focused, however, was in reference to when Ms. Gabbert began working with the Student specifically with respect to the 2015-16 school year. Her other testimony established that she had worked with the Student prior to September 2015. *See* Tr. 250:2–6. But this testimony is still of lesser probative value because the Student's accomplishment of a goal in July 2015 means that he had not in fact accomplished it at the time the IEP was formulated in January of that year.

"collaborative" process in which CSE members drew upon progress reports from the Rebecca School).

Finally, the conclusory, retrospective testimony of Rebecca School personnel before the IHO that certain of the goals in the IEP may have been too difficult does not render it substantively inadequate under the law of this circuit, particularly where, as previously noted, there is no indication that these objections were lodged at the CSE meeting. *See A.M.*, 964 F. Supp. 2d at 285 ("Whether it is realistic for A.M. to attain that achievement in light of her disability is a question of educational policy and expertise that the Court will not second guess.").[11]

### E. Deficient Sensory and Management Needs

The Parent also complains that the IEP failed to adequately address the Student's sensory and management needs. The parties do not dispute that the Student requires a sensory diet.[12] Indeed, the Parent concedes that the IEP adequately acknowledges his needs in this area. The Parent contends, however, that the SRO failed to grasp the nature of a sensory diet because she analogized the specificity demanded by the Parent to a request for a specific teaching methodology.

A teaching methodology is obviously not the same as a sensory diet, and the Court does not believe that this distinction was lost on the SRO. But the SRO's ultimate point—namely, that absent a showing that a specific sensory diet is critical to the Student's development, a particular diet need not be prescribed by the IEP—is valid. *See Y.D. v. N.Y.C. Dep't of Educ.*, No. 14-CV-

---

[11] Consistent with other decisions in this circuit and its own view on the matter, the Court has construed the Parent's challenges to the IEP's goals as substantive in nature. *See L.K. v. Dep't of Educ. of N.Y.C.*, No. 09-CV-2266 (RMM) (LB), 2011 WL 127063, at *9 (E.D.N.Y. Jan. 13, 2011). Some courts, however, have interpreted similar arguments as procedural challenges. *See D.A.B. v. N.Y.C. Dep't of Educ.*, 630 F. App'x 73, 76–77 (2d Cir. 2015) (summary order). In any event, if construed as procedural arguments, for substantially the same reasons the Parent would have failed to establish that any deficiencies denied the Student a FAPE by either resulting in substantive inadequacy or affecting the decision-making process. *See L.O.*, 822 F.3d at 109.

[12] A sensory diet is "a specific sequence of sensory integration techniques or input that is designed to be provided on a schedule to assist the child in maintaining a state of regulation and achieving an optimal arousal level throughout the day." Tr. 255:19–256:1.

1137 (LTS), 2017 WL 1051129, at *8 (S.D.N.Y. Mar. 20, 2017) ("Courts have generally concluded

that an IEP is not required to contain a detailed sensory diet, especially where, as here, the IEP does

contain specific information about [the student's] sensory needs and suggests appropriate ways to

manage them." (collecting cases)); *E.P. v. NYC Dep't of Educ.*, 2016 WL 3443647, at *12 & n.8

(S.D.N.Y June 10, 2016) (IEP not inappropriate simply because it failed to prescribe a sensory diet,

particularly in light of the other sensory supports); *G.B. v. NYC. Dep't of Educ.*, 145 F. Supp. 3d 230,

250 (S.D.N.Y. 2015) (finding IEP sufficient where it "noted" the student's "sensory needs," as well as

his improvement, and provided "specific goals and short term objectives" on the basis that "the goals

and strategies of the IEP is 'precisely the type of issue upon which the IDEA requires deference to the

expertise of the administrative officers'" (quoting *Grim*, 346 F.3d at 382)).[13]

Here, the IEP described at length the Student's sensory needs and the diet methods found

to be effective at the Rebecca School: "The December 2014 Rebecca School report indicates that

[the Student] participates in a sensory diet to maintain an appropriate level of arousal. He presents

with an under-responsive sensory system and requires intense vestibular and proprioceptive input.

He generally presents with a calm, low arousal level. He benefits from both brushing and joint

compression. Oral motor support is also warranted. Decreased body awareness and core strength

impacts upon his functioning." Ex. 1 at 3. Moreover, the IEP mandated five weekly sessions of

occupational therapy. And, as Ms. Fochetta testified, it is typically the responsibility of an

---

[13] Relatedly, the Parent asserts that the SRO impermissibly shifted the burden to him in stating that there was no evidence that any specific sensory diet was necessary to the Student's development. This argument is unavailing. While the Parent accurately quotes the SRO's opinion, he misunderstands the officer's point. Consistent with the law of this circuit, the SRO reasoned that the IEP adequately addressed the Student's sensory needs and that a specific sensory diet need not be prescribed because it, like a teaching methodology, is left to the deference of school personnel. *See T.C.*, 2016 WL 1261137, at *14 ("Unless a specific methodology is required for a student to receive an educational benefit, the choice of pedagogic methodology is appropriately left to the teacher." (citation omitted)), *Y.D.*, 2017 WL 1051129, at *8. The only way for a specific sensory diet to be required would be if there was some evidence that the Student's progress would be so hindered absent that particular diet as to render the IEP substantively deficient. *See T.C.*, 2016 WL 1261137. But this did not impermissibly shift the burden of persuasion to the Parent to demonstrate the IEP's substantive deficiency, which is the proposition for which the case cited by the Parent stands. *See F.L. v. New York City Dep't of Educ.*, 2016 WL 3211969, at *7–8 (S.D.N.Y. June 8, 2016).

occupational therapist to devise a specific sensory diet for a particular student. Tr. 65:11–18. There is thus no basis to disturb the SRO's well-reasoned conclusion.

### III. Placement

The Parent challenges, finally, the school placement, principally the availability of sensory equipment and therapists, the support provided to students in the cafeteria, and the school's functional grouping. These arguments fail because they are either speculative or the purported deficiencies identified by the Parent did not run afoul of the IEP.

In *M.O. v. New York City Department of Education*, the Second Circuit clarified that its precedent "permit[ed] challenges to a proposed placement school when based on more than speculation." *B.P. v. N.Y.C. Dep't of Educ.*, 634 F. App'x 845, 847 (2d Cir. 2015) (summary order). Since *M.O.*, the Second Circuit has distinguished between cognizable challenges to the school's "[]ability" or "capacity" to implement the IEP, in contrast to mere "speculation that the school district would not have adequately adhered to the IEP" despite its ability to do so. *J.C.*, 643 F. App'x at 33 (citation and alterations omitted). Only where parents offer "non-speculative objections to a proposed school" does "'the school district . . . ha[ve] the burden to produce evidence demonstrating the placement's adequacy in response to these arguments.'" *N.M. v. N.Y.C. Dep't of Educ.*, No. 15-CV-1781 (JMF), 2016 WL 796857, at *1 (S.D.N.Y. Feb. 24, 2016), *appeal withdrawn* (June 16, 2016) (quoting *M.O.*, 793 F.3d at 245).

The Parent first argues that the placement school "lack[ed] . . . therapists and sensory equipment." Pl. MSJ at 23. As to the equipment, before the IHO the Parent testified that the school lacked the sort of equipment he found ideal. Tr. 444:20–445:1. But the Parent's desire for sensory equipment other than that mandated by the IEP is not a valid basis on which to conclude that the recommended school site would have been unable to implement the IEP. *See B.P.*, 634 F.

App'x at 848. Indeed, Mr. Soodoosingh, the intake coordinator at P.S. K396, testified that the placement school had a "sensory room," which included, *inter alia*, a ball pit, mats, trampoline, swing, compression roller, bean bags, bolsters, and a one-hand exercise machine. Tr. 136:14–138:7.

Even assuming, however, that the school lacked equipment that was in fact mandated by the IEP at the time it was formulated, courts routinely reject such objections as speculative. *See E.P. ex rel. E.P. v. NYC Dep't of Educ.*, No. 14-CV-6032 (ARR), 2015 WL 4882523, at *7 (E.D.N.Y. Aug. 14, 2015) ("[T]he record does not show that the DOE was unwilling or unable to obtain the equipment necessary to satisfy the IEP, had E.P. actually attended public school."); *B.K. v. Dep't of Educ.*, 12 F. Supp. 3d 343, 372 (E.D.N.Y. 2014) ("Plaintiffs are unable to show that the Department was unwilling or unable to obtain any equipment necessary for G.K.'s instruction under the IEP, should he have been enrolled at [the school]."). The Court sees no basis to depart from this precedent. The Parent also asserts in conclusory fashion that the placement site lacked therapists. There is no indication, however, that the site lacked therapists necessary to implement the services mandated by the IEP.

The Parent also described, in his view, the school's inability to provide a proper cafeteria setting. Tr. 445:2–9. Mr. Soodoosingh testified, however, that paraprofessionals from the 6:1:1 special classes accompanied students to the cafeteria where each class had its own assigned table. Tr. 139:20–140:12, 148:13–149:2. Additionally, two adult licensed professionals, both trained in CPR, were always present in the cafeteria and individual speech teachers were available to assist students who required additional help. Tr. 139:20–140:12. These supports comported with the IEP, which noted that the Student was independent in feeding but nonetheless indicated the need for oral motor support and included goals related to his oral motor skills. Ex. 1 at 3, 8. The IEP, moreover, did not mandate any specific cafeteria size or particular type of feeding therapy. *See generally* Ex. 1. Furthermore, the general nature of the cafeteria setting is typically an invalid basis on which to maintain a placement

challenge. *See J.M. v. N.Y.C. Dep't of Educ.*, 171 F. Supp. 3d 236, 253 (S.D.N.Y. 2016) (finding that a noisy lunchroom did not prevent a recommended school site from being able to provide the student with the appropriate environment mandated by the IEP and parent's claims to the contrary were impermissibly speculative).

Lastly, the Parent argues, the DOE failed to prove that it would comply with state requirements regarding functional grouping. *See* Pl. MSJ 23–24. This argument fails for two reasons. First, the Parent's argument is speculative because there was no guarantee as to the composition of the class in which the Student would have been placed had he attended the proposed placement. *See J.C.*, 643 F. App'x at 33; *M.S. v. NYC Dep't of Educ.*, 2 F. Supp. 3d 311, 332 n.10 (E.D.N.Y. 2013). Second, because the challenge is speculative and this argument pertains to the placement site rather than the substantive adequacy of the IEP, the DOE does not bear the burden of persuasion. *See M.O.*, 793 F.3d at 245–46.

## CONCLUSION

For the reasons stated above, the Parent's challenges fail and the Court defers to the SRO's conclusion that the DOE offered the Student a FAPE for the 2015-2016 academic year. The DOE's motion for summary judgment is thus granted, and the Parent's motion is denied. The Clerk of Court is respectfully requested to enter judgment in favor of Defendant, terminate the motions pending at docket entries fourteen and nineteen, and close the case.

SO ORDERED.

Dated:   September 26, 2018
         New York, New York

Ronnie Abrams
United States District Judge